UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JULIE KIRK,

        Plaintiff,

    v.                                           Case No. 09-C-0990

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff Julie Kirk (hereinafter "Plaintiff" or "Kirk") seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") under Title II and Supplementary Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 405(g). Plaintiff alleges that she is disabled by fibromyalgia, depression, asthma, diabetes, and obesity. (Tr. 102.) The Social Security Administration denied her DIB applications and Plaintiff requested a hearing.

After a March 8, 2007 hearing Administrative Law Judge Ahlgren denied Plaintiff's disability claim. The Social Security Appeals Counsel remanded the case for another hearing "under the substantial evidence and new and material evidence provisions of the Social Security Administration regulations (20 C.F.R. 404.970 and 416.1470)." (Tr. 300.) On December 18, 2008 Plaintiff had a supplemental hearing in front of Administrative Law Judge Robert L. Bartelt (hereinafter "ALJ"). Plaintiff, represented by counsel, appeared and testified. Based upon Plaintiff's testimony, the testimony of a vocational expert, the testimony of a medical expert, and

the medical evidence presented, the ALJ concluded, in a 14-page decision dated January 23, 2009, that Plaintiff did not have an impairment or combination of impairments qualifying her for benefits. The ALJ opined that Plaintiff retained the residual functional capacity ("RFC") to "perform routine, low stress, sedentary work activity that allows for position changes (sit/stand) and requires very little, if any, bending, twisting, crouching, crawling, or full body movements" (Tr. 21.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review on August 18, 2009.

Kirk argues that the ALJ failed to comply with the Social Security Administration's Ruling governing determination of a claimant's RFC, failed to properly weigh the opinions of her treating physicians, and failed to properly assess her credibility. Based on its review of the entire record, the Court concludes that although the ALJ committed some errors, none of them require reversal and substantial evidence supports the decision. Accordingly, the decision of the Commissioner will be affirmed.

## BACKGROUND

Kirk applied for Social Security Disability benefits on September 21, 2004, stating that her disability began on April 1, 2000. (Tr. 56-61, 587.) At the time of the hearing before the ALJ, Kirk was forty-three years old. (Tr. 599.) She has two grown children from a first marriage and is currently married to a man who receives DIB and works part-time at Goodwill Industries. (Tr. 613-14.) She is a college graduate and earned a Master's Degree in Environmental Science and Policy from the University of Wisconsin, Green Bay in 1994, but was unable to find a job in her field. In fact, Kirk testified that she has never held full-time employment of any kind because she was never

physically able to work full-time.  (Tr. 635.)  She has had occasional part-time work but her earnings were very low, and the ALJ concluded that she has not engaged in substantial gainful activity since at least April 1, 2000, the date of her alleged onset of disability. (Tr. 19.) Kirk is 5' 7" tall and weighs approximately 300 pounds. (Tr. 618.)

Kirk testified that prior to 2000, she worked part-time as a waitress but never for more than three days in a row because of pain.  She had also worked as a swing shift manager for a fast-food restaurant for as many as eight hours in one day, but never for two days in a row also because of pain.  (Tr. 638.)  Kirk testified that her most recent part-time employment was in 2006 as a telephone market researcher.  She would make phone calls from a call list, conduct an interview using a script, and write down the answers she was given.  Although she was tethered to a phone, Kirk testified she was free to sit or stand while she was conducting an interview.  (Tr. 636.)  She testified that she was limited to two or three-hour shifts for a maximum of ten hours a week, however, because of the pain involved in sitting and writing.  It hurt even to sit, she claimed, and thus even if she was able to make it through a shift, she would be unable to work the next two days because she would be unable to sit.  (Tr. 602.)  Kirk also testified that she had pain and swelling in her hands and fingers that prevented her from doing the writing necessary to complete the phone surveys.  She attributed the back pain to fibromyalgia and the pain in her hands to psoriatic arthritis, which also affected her feet and toes.  (Tr. 602-03.)

Kirk testified that her hands and fingers were so crippled that she could not handle a large water glass in a restaurant.  (Tr. 603-04.)  She wasn't sure if she had a burning sensation in her fingers because she was "on lots of painkillers."  (Tr. 604.)  The pain in her feet was so severe, especially at night, that it interfered with her sleep.  If even a blanket touched her foot, "it sends me

3

through the ceiling in pain." (Tr. 640.) The psoriatic arthritis, together with the bone spurs and bunions on her feet, made standing and walking difficult. (Tr. 640-42.)

Kirk also complained of severe pain in her back. She testified she carried large ice packs with her and would pack them around her waist. If she was pushed anywhere on her lower back, she would "go through the ceiling." (Tr. 642.) But even if no one was touching her, she had a lot of pain in her right hip and leg. "It feels like, like somebody's ripping my right leg off, like somebody's just trying to pull it off." (*Id.*) Then, when the pain gets bad enough, Kirk testified that she would start throwing up "five hours straight, easy, when the pain gets that bad in my back." (*Id.*) Throwing up would then cause pain in her ribs. (Tr. 643.) Although she claimed to have "lots of different types of pain medication," it only helped "to a point." (*Id.*) On average, she estimated her pain at a 4 or a 5 on a 10-point scale with 10 the most severe, and she could get herself down to a 3 by the end of the day "in time for the horrendous night pain." (Tr. 644.)

Kirk also testified that she was being treated for bipolar disorder or depression and also saw a therapist. She said that sometimes she sleeps three or four days, and then other days she would be "bouncing off the walls." (Tr. 644.) She would be up at 2:00 in the morning typing letters. She testified that normally she got along with other people and did not get into arguments. When she did not feel well, however, she didn't want to be around people, and at times thought of hurting herself. (Tr. 646.)

Kirk's testimony regarding the medications she actually took was not consistent with the severe pain she described and her claim that she had "lots of different types of pain medication. The only prescription medication she took regularly for pain was Celebrex, a non-steroidal anti-inflammatory drug. (Tr. 605.) She also testified that she had a prescription for Vicodin, but only

4

took a couple every three weeks. (Tr. 606.) More often she took Tylenol or Aleve. (*Id.*) She took Cymbalta for her depression, Glipizide for her diabetes, Captopril for high blood pressure, and Lovastatin for high cholesterol. (Tr. 605.) Kirk testified that her high blood pressure and diabetes were both under control. (Tr. 639, 652-53.) She also had asthma which was more seasonal, but would become active with emotional stressors, dust or perfume. She was able to control it with Advair. (Tr. 646-47.)

Kirk estimated the most she could lift on a repetitive basis would be eight pounds. (Tr. 646.) She estimated the longest she could stand in one place would be four minutes. (Tr. 641.) At most, she estimated she could sit for ten-to-fifteen minutes, but even then she would be wriggling. (Tr. 642.) She considered a good night two, maybe three straight hours of sleep. She also napped during the day in between alternating ice packs and heating pads to deal with her pain. (Tr. 648.) Her goal each day was to get a shower by noon and then get to a food pantry to make sure there is food on the table by the end of the day. (Tr. 647.) She can cook, do light cleaning and laundry, shop, read, sew, crochet, watch television, use a computer, pay bills, care for her pets, and care for her personal needs. (Tr. 20 citing Exhibits 2E, 3E, 9E, 10E, and 23F.) In 2006 Kirk's brother agreed to pay her $500 a month to manage his apartments (Tr. 447) which improved her mood and allowed her to do "many things" to care for the apartments. (Tr. 443.)

Medical documentation in the administrative record covers the period between 2001 and 2008. Kirk's primary physician was Dr. Lysecki who she saw at Bellin Family Medical Center in DePere. Because she did not have insurance, however, she also went to the free clinic in Green Bay where she saw Dr. Christopher Pinn. (Tr. 652-53.) Kirk first saw Dr. Lysecki on November 19, 2001, and reported she had a long-standing history of fibromyalgia over the past 16 years. She

reported she was in the process of applying for disability and had been denied two or three times but was now contemplating an appeal. She said she was having quite a bit of difficulty getting up and around, and had even used a wheelchair to do her Christmas shopping the previous year. She stated she had been bothered by restless leg syndrome, but it was not currently active. She was currently taking Effexor, which is used to treat depression, and tried to get some exercise. (Tr. 157.)

Records from Bellin Family Medical Center reveal routine visits with a nurse practitioner for bronchitis in December 2001, a blood pressure check in September 2002, and a bee sting in October 2002. (Tr. 153-156.) On December 2, 2002, she complained of increased pain from fibromyalgia, along with several family problems. She was started on Celebrex and was doing well two weeks later. (Tr. 150-151.) In 2003, she was seen for a blood pressure check on January 16, for cough and congestion on January 28, for bronchitis on February 7, asthma on February 20, and April 10, and follow-up exams on July 18 and October 17. (Tr. 143-49.) The records disclose no significant treatment for complaints of pain or fibromyalgia flare-ups.

The same pattern continued in 2004. Kirk would see a doctor or nurse practitioner at Bellin Family Health clinic regularly for routine ailments and medication checks, but there is no report of increase in fibromyalgia symptoms or change in treatment. Kirk was continually told to lose weight, watch her diet, and try to exercise. (Tr. 138-42.) In a September 3, 2004 report, which lists her chief complaints as "Request for disability," the nurse practitioner notes "Patient had a functional capacity assessment done by Curative Rehab workshop and she is unpleased with the results that they have forcibly evaluated her functional capacity and she would like a re-evaluation." (Tr. 137.) She also requested a referral for a psychiatric evaluation to consider her for disability for her

depression and fibromyalgia, which after 25 minutes of counseling the nurse agreed to provide. (*Id.*)

There are no records from Bellin Family Medical Center for 2005, and the only visits that are documented in 2006 are for a mammogram in February, a sinus complaint in June, and an annual physical in December. (Tr. 409, 414, 416.) The subjective portion of the report of her physical states: "Overall she has been doing well. She has had longstanding fibromyalgia and is unable to work because of this. She has been trying to do some routine fitness." (Tr. 409.) The objective portion indicated she had "full range of motion" in her extremities. (*Id.*) None of the records from Bellin Family Medical Center mention psoriatic arthritis. Also absent is any indication that Kirk ever complained to Dr. Lasecki or her staff of the kind of near constant and disabling pain she described at the hearing. In November 2008, about a month before her second hearing, Kirk underwent lumbar spine imaging, which revealed severe degenerative spondylosis. (Tr. 576.) The reporting physician noted, however, that the image quality was "compromised by patient motion and body habitus." (*Id.*) No medical reports in the file discuss the findings further.

On December 16, 2004, Kirk began chiropractic treatment at Howard Chiropractic Center in an attempt to get her fibromyalgia under control. (Tr. 245.) She reported she was having both mid/low back and hip pain that started increasing when she took a bus to and from Boston over Thanksgiving. An X-ray taken of her lumbar spine at the time showed "facet imbrication with very mild arthritic change taking place." (Tr. 244.) Over the following month-and-a-half she had sixteen visits for manipulations and ultrasound. Throughout that period of time she consistently reported improvement with few exceptions. (Tr. 242-45.) At her last visit on February 2, 2005, she reported

"she has been doing much better. Less pain and discomfort into the hips and mid-back area." (Tr. 242.)

Kirk also saw Dr. Pinn at the N.E.W. Community Clinic in Green Bay between in 2005 and August of 2007 (some of the specific dates are not shown). (Tr. 275-83, 544-60.) Kirk explained that the procedure at the community clinic is that she would "stand in line for hours waiting to pull a number to see a doctor." (Tr. 653.) To the extent the notes of these visits are legible, they seem to simply record Kirk's complaints, some of which relate to fibromyalgia, but do not indicate the frequency or severity of pain Kirk described at her hearings. For example, one entry indicates she complained of left arm pain due to fibromyalgia. "Otherwise doing well." (Tr. 279.) The records from the NEW Community Clinic also included Diabetic Foot Screen reports that indicated Kirk had no foot ulcers, toe deformity, elevated skin temperatures, swelling or abnormal shape of her feet or muscle weakness. (Tr. 545, 547, 550.) It appears that Dr. Pinn was for the most part monitoring her medications and refilling her prescriptions. At one point Kirk requested a prescription for Vicodin for flare-up of her fibrmyalgia, but was told "no." (Tr. 277.) The records reflect, and Kirk also testified, that Drs. Pinn and Lystecki consulted one another in their treatment of her. (Tr. 276, 653.) Again, there is no mention of psoriatic arthritis.

On December 6, 2005, however, apparently on her fourth visit, Dr. Pinn did fill out a Physical Residual Functional Capacities Questionnaire that was addressed to Dr. Ahmed. (Tr. 267, 279.) He listed her diagnoses as fibromyalgia, psoriatic arthritis, and diabetes, and her prognosis as fair. The only symptom noted on the form was "migrating muscular pain" in the hips, arms and shoulders, the nature, frequency and severity of which was described as "variable" and "unpredictable." (*Id.*) In the space in which Dr. Pinn was asked to "identify the clinical findings

and objective signs," he wrote what appears to read "mild psoriasis back of neck." (*Id.*) Dr. Pinn noted that emotional factors contributed to the severity of Kirk's symptoms and functional limitations, and listed bipolar disorder as a psychological condition affecting her physical condition. (Tr. 268.) He also checked the form to indicate that during a typical workday, Kirk's pain or other symptoms would be severe enough to "constantly" interfere with the attention and concentration needed to perform even simple work tasks. (*Id.*) Dr. Pinn indicated she would be incapable of tolerating the stress of even "low stress" jobs and wrote as a reason for his conclusion that she "has never worked full time job." (*Id.*) The longest she could sit at one time he estimated at 15 minutes. For standing, he estimated 30 minutes to one hour. (*Id.*) In an 8-hour day he estimated she could sit and stand/walk less than 2 hours altogether. She would also have to walk every 20 minutes for between 5 and 10 minutes. She could lift less than 10 pounds rarely in a competitive work situation, rarely look down with sustained flexion of her neck, and rarely twist, stoop, crouch/squat, and climb ladders or stairs. She could use her hands for grasping, her fingers for fine manipulation, and her arms for reaching only 25% of the time in an 8-hour day. (Tr. 270.) Finally, Dr. Pinn estimated that on average she would be absent from work because of her impairments or treatment for more than four days per month. (*Id.*)

Kirk began seeing Dr. Ashraf Ahmed, a psychiatrist at Bellin Behavioral Health Clinic on September 21, 2004, on a referral from a therapist there who found her unresponsive to psychotherapy after two sessions. Kirk reported that she felt overwhelmed, restless and hopeless. She complained that everyone is unsupportive of her, especially those in the medical field, and no one is willing to help her. She gave Dr. Ahmed "an elaborate description of her pain condition and the medical care she has been receiving for that as well as how frustrated she is with everybody."

(Tr. 263.)  She complained of pains in her knees, back, and muscles, and said she aches day and night and cannot focus.  She said she had headaches, as well as tenderness in different parts of her body, and explained that sometimes she cannot stand and do things.  She explained that her "depression comes secondary to all this."  (*Id.*)  Dr. Ahmed noted that she was alert and oriented, cooperative and showed no abnormal movements.  She appeared to be guarded, overwhelmed, angry, irritable and resentful.  Her mood was depressed and labile.  She appeared to be under a tremendous amount of stress and was desperately seeking help for her condition.  (Tr. 261.)  After a 75-minute session with her, Dr. Ahmed listed a primary diagnosis of major depressive disorder, recurrent and severe, with a secondary diagnosis of history of dysthymia.  He listed her global assessment of functioning ("GAF") at 35.  (*Id.*)  By way of treatment, Dr. Ahmed decided to gradually decrease the dosage of Effexor Kirk was taking and replace it with Cymbalta and follow up as warranted in two months.  (Tr. 265.)

Kirk returned to Dr. Ahmed two weeks later on October 5, 2004, for a 45-minute medication management and supportive therapy.  Kirk appears to have repeated her complaints, and Dr. Ahmed provided her with "a lot of support and encouragement."  (Tr. 262.)  He increased her dosage of Cymbalta, added an Axis 2 diagnosis of "personality disorder, not otherwise specified," and offered a further follow-up in one month.  (*Id.*)

She returned on October 21, 2004, complaining about her husband's "demanding childish needy attitude in which he asks her to do everything for him or go behind him and fix everything." (Tr. 260.)  Dr. Ahmed thought she appeared less depressed but Kirk did not agree, so he agreed to continue her on the Cymbalta for another two weeks to see how the medication was working.  (*Id.*) When she returned on November 16, 2004, she reported that she felt "a little bit better" and was

10

"less depressed." (Tr. 259.) On interviewing her, however, Dr. Ahmed noted "you can see how the patient is tired, fatigued, angry, and irritable." (*Id.*) He recommended increasing the Cymbalta, but Kirk refused because "she was scared that the medication might alter her mental state." (*Id.*) Dr. Ahmed also noted "I still do not think the patient can work and I really recommend her to seek disability again." (*Id.*)

The reports of visits over the following month are largely the same. In December Dr. Ahmed noted Kirk had not shown much improvement. She reported being depressed with little motivation or energy. She had a lot of anger and resentment and was unable to concentrate or focus. Despite the lack of improvement she did not want to change medications because in the past, changing medications led to more problems. (Tr. 258.) In January of 2005, she reported essentially the same symptoms, and Dr. Ahmed noted that she appeared disheveled and unkempt. (Tr. 257.) In February she was "really mad" and "really upset." (Tr. 256.) She was disappointed in many people, including her doctor. She felt nobody wanted to spend the time and effort to solve her problems and said she had episodic suicidal thoughts. Dr. Ahmed noted she seemed to have mood swings and changed her diagnosis to Bipolar Disorder, Type I. (*Id.*) Following her visit, Dr. Ahmed wrote a letter dated February 15, 2005, to the State Disability Specialist in which he stated that Kirk was completely disabled and unable to function. Dr. Ahmed's letter reads:

> She has a severe degree of mood swings, anger, and great difficulty handling severe depressive episodes. She has been tried on numerous antidepressants and mood stabilizers with very limited success. The patient is very discouraged and she really cannot function. Her ability to sleep and eat is completely disturbed and erratic. Her ability to relate to other people is very difficult. The patient has very frequent mood episodes in which she really feels out of control and threatening to herself and others. She was on the verge of getting admitted many times, but eventually was able to contract safety and we did not admit her. I believe the patient is very disabled and I highly recommend your department to look into her case.

(Tr. 255.)

11

The next report from Dr. Ahmed is more than two years later on June 28, 2007. Dr. Ahmed notes that she came in that day reporting that she had been through a lot of trouble recently, had not been able to get disability, and was struggling financially to the extreme. She felt nobody was listening to her and was very frustrated and extremely depressed. Dr. Ahmed repeated his view that she was incapable of work, directed her to continue on Cymbalta, and indicated he would support her by writing another letter indicating her condition. (Tr. 423.) In a June 29, 2007 letter to the State Disability Specialist, Dr. Ahmed reiterated his opinion that Kirk was completely disabled due "a severe case of major depressive disorder." (Tr. 422.) He noted that she was currently on Cymbalta, and stated that he cannot see her often or adjust her medication "simply because she cannot afford the medication." (*Id.*)

At the request of the Wisconsin Division of Vocational Rehabilitation, Mark Ringwelski, an osteopathic physician at Occupational Health Solutions, performed an employability evaluation on Kirk on April 24, 2004. Dr. Ringwelski reported that Kirk demonstrated full range of motion of her shoulders and back without apparent difficulty, as well as her hips, knees and ankles. She reported some tenderness on palpation, but often responded "not today," suggesting that she has tenderness at other times. She had good grip strength in her hands, and her deep tendon reflexes were symmetrical for both lower and upper extremities. A brief functional assessment revealed she was able to lift up to 30 pounds on an occasional basis. She was able to lift 17 ½ pounds above her waist and 27 ½ pounds in a two-handed carry. She was able to work up to an occasional basis with arms overhead, able to climb stairs occasional to frequent, and able to do forward bending in standing on an occasional to never basis. All of her testing was limited due to subjective complaints of pain, and she told the occupational therapist that they were catching her on a good day. Based

on the testing, Dr. Ringwelski recommended an overall lifting restriction of 30 pounds below the waist, up to 15 pounds above the waist, and that she avoid frequent bending and twisting. (Tr. 107.) Dr. Ringwelski concluded that Kirk's ability to work was limited by her subjective complaints of pain and the anxiety Kirk associated with work. Dr. Ringwelski also noted Kirk's expressed unwillingness to give her "best hours to work on a regular basis." (Tr. 107-08.)

In June 2004 Kirk underwent a vocational evaluation at Curative Rehabilitation. (Tr. 126-29.) Although she was scheduled for a five-day evaluation, she was present for only three days of activity and came in on the fourth to discuss the results of her assessment. She claimed she was unable to attend on the other days due to pain from fibromyalgia. The report noted that throughout the three days she did participate, she reported that her fibromyalgia pain moved around her body and the pain was unpredictable, and "repeatedly voiced concerns about having to work during the few hours she was feeling good" instead of spending time with her family. (Tr. 128.) The report also noted that "she was observed not displaying any of the usual pain behaviors of someone experiencing severe pain, and her reported pain levels were in the moderate range of 4, 5,6/ 0-10. She sat with her leg crossed over the other one, and did not change positions frequently." (*Id.*) The evaluator noted that "she seemed to put up roadblocks to pursuing any type of employment, and this may be exasperating her pain." (Tr. 129.) She was recommended for participation in a graduated "work hardening" situation within a computer software course at the computer lab at Curative where she would have the opportunity to improve her computer skills while building her endurance and her ability to be productive in spite of her pain. (*Id.*)

As recommended, Kirk began the Clerical Training Program at Curative on July 6, 2004. She was scheduled for two mornings per week with a plan to add extra days as she progressed.

Kirk attended only nine days from July 6 through August 26, 2004, when she terminated because she felt it would aggravate her fibromyalgia. (Tr. 121, 123-24.) She missed several days because of pain, but again did not appear to display significant pain behaviors. (Tr. 121.) The note on her last day stated "she has been observed freely crossing her legs in her chair in front of the computer, sitting for 3-hours without standing or asking for a break, and using poor body posturing while sitting in front of the monitor." (Tr. 124.) The Program Instructor noted the "it seemed that Julie placed many barriers to being successful in the training program and/or employment, and recommended that she continue her appointments at Riverside Psychiatric Group for personal counseling and pain management." (Tr. 121.)

In July 2005, Kirk began seeing Judith Turba, a counselor at Catholic Charities of the Diocese of Green Bay, whose reports were countersigned by a psychiatrist. (Tr. 495.) The intake note lists her complaint as depression resulting from chronic pain which she attributed to fibromyalgia. (Tr. 491.) Under the heading "mental status," Ms. Turba noted that Kirk presented in a neatly dressed and well-groomed fashion. Her eye contact was good and her speech was logical, coherent, and goal-directed. Her recent and remote memory was not impaired. Her psychomotor activity was characterized by normal movements and activity level. Although a negligible degree of conceptual disorganization was evident, her thought content was characterized by no significant preoccupations. Her attitude was described as cooperative and interested, and she had good judgment and impulse control. Her attention/concentration was characterized by an ability to attend and maintain focus. (Tr. 433.) Her current GAF was assessed at 55, and her highest over the past year was 60. (Tr. 492.) The treatment plan consisted of individual therapy using a cognitive-behavioral approach. (Tr. 495.)

In her sessions with Ms. Turba, Kirk expressed anger at "the system" for not recognizing her need for disability payments and at her doctors for not better specifying her limitations. (Tr. 491.) Ms. Turba later noted that she was defensive and "appears to struggle with accepting feedback." (Tr. 488.) She was accepted as a substitute teacher by the DePere public school system, but was concerned about following rules since she had a tendency to do things her own way. (Tr. 487.) Over the following two years, Kirk met with Ms. Turba for regular sessions one or two times per month at which she discussed her various health problems, as well as problems with her husband, her daughter and money, and explored different interventions to help her cope with them. Ms. Turba consistently noted her ability to focus on relevant topics and see different perspectives. She was able to accurately identify and express feelings, was active and verbal in her sessions, and exhibited a moderate degree of compliance with treatment. (Tr. 428, 430, 432.)

In November 2004, Pat Chan, M.D., an agency consultant, reviewed Kirks' records and filled out a Physical Residual Functional Capacities Assessment. Dr. Chan opined that Kirk could perform light work, but should avoid moderate exposure to humidity and fumes, odors, etc. (Tr. 224-231.) Another medical examiner reviewed her records and affirmed Dr. Chan's opinion in March 2005. (Tr. 231.) Dr. Chan again reviewed the records and completed another Physical Residual Functional Capacities Assessment in October 2007, this time concluding that she remained capable of performing sedentary work as long as she avoided concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 497-504.)

Mental health consultant, Keith Bauer, Ph.D., reviewed the records and filled out a Mental Residual Functional Capacities Assessment in November 2004. Although Dr. Bauer concluded Kirk's mental condition did not meet or equal any listing, he reported moderate limitations in her

activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence and pace. (Tr. 210, 220.) More specifically, Dr. Bauer indicated moderate limitations in the following categories: the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to respond appropriately to changes in the work setting. (Tr. 232-33.) Dr. Mattau, another mental health consultant reviewed the records and affirmed Dr. Bauer's assessment in March 2005. (Tr. 234.)

In February 2008, Kirk was evaluated by Steven Krawiec, Ph.D. According to Dr. Krawiec's report, Kirk arrived at the appointment alone and he observed nothing remarkable about her gait or station. "She did not exhibit any pain behavior." (Tr. 566.) Her affect was "on the bright side and she seemed quite animated and a bit driven." (*Id.*) Her speech was well organized, understandable and goal-directed. In summary, based her own report of her symptoms and the reports he reviewed, Dr. Krawiec concluded that during her "low" phases, Kirk would have difficulty mustering the energy to go to and remain at work. During her "high" phases, he thought she might be "a little scattered and disorganized." (Tr. 568.) Dr. Krawiec went on to conclude, however, that "she had adequate cognitive capacity to understand and carry out simple job instructions," and that "significant problems with attention, concentration, or memory were not in evidence." (Tr. 568-69.) He thought "workplace changes and stressors might exacerbate her mental health/emotional difficulties," but thought she would be able to get along adequately with coworkers, supervisors, etc." (Tr. 469.)

In addition to the documentary medical evidence contained in the record, the ALJ also considered the testimony of a medical expert who was present at the hearing. Based upon his view

of the medical evidence and Kirk's testimony, Allen L. Hauer, Ph.D., testified that in his opinion the evidence showed that Kirk had a dysthymic disorder which he described as a chronic low- to mid-grade depressive disorder. (Tr. 658.) Dr. Hauer did not believe that this impairment met or equaled the "B" or functional criteria of the listing for such disorders. She had a mild restriction in her activities of daily living, but no restriction in her social functioning, and only moderate impairment in concentration, persistence and pace. Finally, there were no episodes of decomposition. Dr. Hauer also rated as good her ability to relate to co-workers and supervisors, her ability to deal with changes in routine work settings, and her ability to relate to members of the public. (Tr. 659-60.) He thought her judgment in the workplace would be good, as well as her ability to maintain concentration and attention to work tasks. He thought she had an excellent ability to understand, remember and carry out complex as well as simple work instructions. (Tr. 660.) Although Dr. Hauer agreed there would be times when Kirk would not be very efficient at work, not focused, not as productive, he thought that she would still have a good ability to complete a normal workday and workweek without interruption from psychological symptoms. (Tr. 660, 662.)

Finally, the ALJ also considered the testimony of a vocational expert, Robert Neuman, a certified rehabilitation counselor and licensed professional counselor. (Tr. 664.) Assuming a person with Kirk's age, education and work experience was restricted to sedentary jobs with an option to sit or stand but which would allow minimal if any bending, twisting, or other movements of the trunk, Neuman testified that there would be a substantial number of jobs she could perform, including information clerk, interviewer and office clerk. (Tr. 666-67.) On the other hand, if he assumed that Kirk's limitations were as she testified, there would be no jobs she could perform. (Tr. 667-68.)

Based upon the entire record, the ALJ applied the familiar five-step sequential evaluation process mandated by the Social Security regulations. *See* 20 C.F.R. § 404.1520. He found first that Kirk was currently unemployed. At step two, the ALJ found that she had the following medically determinable severe impairments: degenerative disc disease, spondylosis, morbid obesity, asthma, and dysthymic disorder. (Tr. 10.) The ALJ then concluded that none of her impairments, alone or in combination, met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Kirk had the RFC to perform routine, low stress, sedentary work activity that allows for position changes (sit/stand) and requires very little, if any, bending, twisting, crouching, crawling, or full body movements. At step four the ALJ found that Kirk had no relevant previous work experience, and thus proceeded to step five where he found that Kirk was not disabled because she retained the RFC to perform a significant number of jobs that exist in the national economy.

Plaintiff raises three major issues with the ALJ's determination: (1) the ALJ failed to properly assess Kirk's physical and mental Residual Functional Capacity ("RFC"); (2) the ALJ afforded improper weight to medical sources, particularly Dr. Ahmed; and (3) the ALJ erred in his credibility analysis and improperly rejected Plaintiff's complaints concerning fibromyalgia. The Court will address each argument, but for convenience and clarity will address them in reverse order. First, it is necessary to set out the standard of review.

## STANDARD OF REVIEW

A district court's review of a social security appeal is limited to determining whether the ALJ's decision is supported by substantial evidence and based on the proper legal criteria. *Scheck*

*v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation omitted). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). However, "[i]n coming to his decision . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Scheck*, 357 F.3d at 699 (citation omitted). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citation omitted). If the ALJ commits an error of law, however, reversal is required unless the error is found to be harmless. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir.2003) (applying harmless error review to ALJ's determination). The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2003); *see also Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge from the evidence to the result. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citations omitted). While it is true that the ALJ's decision must reflect a fair assessment of evidence and be free of fatal gaps and

19

contradictions, it is also true that a reviewing court must "give the opinion a commonsensical reading rather than nitpick[] at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

Finally, an agency's decision cannot be defended on grounds the agency did not rely on. This principle, known as the *Chenery* doctrine, is applicable to judicial review of disability determinations. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). But this does not mean that the agency's lawyer is precluded from referring to evidence in the record that supports the agency's decision that the ALJ did not expressly cite. The ALJ need not cite every shred of evidence supporting his findings in order for his decision to be upheld. The standard is whether the decision is supported by substantial evidence in the record, not whether the ALJ has repeated each piece of evidence supporting his decision. It is the record the court is called upon to review, not merely the ALJ's written decision. Judicial review is not simply cite-checking the ALJ's decision. Citing evidence not mentioned by the ALJ to support findings the ALJ actually made is thus not the same as offering new grounds to support the ALJ's decision that the ALJ did not rely on. The latter is a violation of the *Chenery* doctrine. The former is part of what is required for judicial review.

## I. ALJ's Credibility Analysis

Kirk contends that the ALJ failed to comply with SSR 96-7p and "Seventh Circuit mandates" in assessing her credibility. SSR 96-7p governs the ALJ's assessment of allegations of pain or other disabling symptoms. It requires the ALJ to follow a two-step process. First, he must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the alleged symptoms cannot be found to affect his ability to work. If, however, the ALJ finds that the claimant has an impairment that could

produce the symptoms alleged, the ALJ must determine the extent to which the symptoms limit his ability to work.  In making this second determination, the ALJ considers the entire record, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The Seventh Circuit has addressed the requirements of SSR 96-7p and the standard of review it employs in assessing the credibility of a Social Security disability claimant on many occasions:

> Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In this regard it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.* It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.

*Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001).  At the same time, "[t]he requirement that the ALJ articulate his consideration of the evidence is deliberately flexible." *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir. 1992).  The "ALJ need not provide a complete written evaluation of every piece of testimony and evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  Moreover, an ALJ's credibility determination is viewed with deference because the ALJ, not a reviewing court,

is in the best position to evaluate credibility. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)). A reviewing court will reverse the ALJ's credibility determination "only if it is so lacking in explanation or support that we find it 'patently wrong.'" *Id.* (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008)).

In this case, upon comparing Kirk's testimony at the administrative hearing to the medical records, the ALJ concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 26.) In support of this conclusion, the ALJ first noted that the severity of symptoms Kirk attributed to her physical impairments was not substantiated by the medical evidence of record. (Tr. 26.) While the ALJ may not reject a claimant's testimony regarding the severity and extent of pain at the second step of the SSR 96-7p analysis based solely on the absence of medical evidence, this does not mean that the absence of medical evidence is not a factor to be considered. Indeed, SSR 96-7p explicitly states that "the medical signs and laboratory findings, [and] the individual's own statements about the symptoms . . . " are among the evidence the ALJ must consider in assessing the claimant's credibility at second step of the process. SSR 96-7p, 1996 WL 374186 *2. Here, as the ALJ noted, the medical records disclose few, if any, signs or laboratory findings supporting Kirk's complaints. Also absent from the medical record, for the most part, is any mention of the kind of severe, disabling, and near constant pain Kirk described in her testimony at two separate hearings. There is virtually no mention of the crippling effects of psoriatic arthritis on her feet and hands that she described in any of the records. (Tr. 603-04, 640-42.) And while the records do

disclose some complaints which she attributed to fibromyalgia, they are not nearly as frequent and severe as Kirk's testimony would suggest. The fact that her treatment remained essentially unchanged throughout the seven years covered by the records is also inconsistent with her claim that she could obtain no relief from the kind of severe and disabling pain she described in her testimony.

The ALJ also described in detail the vocational evaluation Kirk underwent at Curative Rehabilitative which resulted in lifting restrictions of 30 pounds below the waist and 15 pounds above. The evaluating physician expressly noted her subjective complaints of pain and anxiety and her stated unwillingness to give her "best hours to work on a regular basis." (Tr. 23.) Similar observations were made by the staff who further evaluated her and later worked with her in the Clerical Training Program that she began in July of 2004. Although she complained of pain from her fibromyalgia, she did not exhibit what the staff regarded as behaviors one normally sees in a person experiencing severe pain. Despite her claim that she was extremely limited in her ability to sit without constant wriggling, she was observed sitting in front of a computer with her legs crossed for three hours without standing or asking for a break. (Tr. 124.) The ALJ noted she complained about having to participate in the program, had poor attendance, and failed to complete it. In the view of the staff, she was not strongly motivated to work. (Tr. 23.) And though this was four years prior to the hearing, Kirk's claim is that she has been disabled her entire adult life, or at least since April 2000.

The ALJ contrasted the fact that Kirk reported that she used a wheelchair and a cane on her application for benefits with the fact that "there is no evidence in the record that she was ever prescribed either of these devices." (Tr. 27.) He noted her prescriptions included Celebrex (an anti-inflammatory) and the occasional Vicodin, which she only took once every three weeks or so "when

it gets real bad." (Tr. 24, 606.) This evidence is hard to reconcile with her testimony that she was "on lots of painkillers" (Tr. 604), and is far more consistent with the lack of complaints of severe, disabling pain in the medical reports. Moreover, despite the relatively minimal medication she was taking, the ALJ noted she "reported improvement . . . on several occasions" (Tr. 26), as she also "experienced improvement with chiropractic treatment." (*Id.*)

It is true that Kirk claimed she was capable of only limited daily activities, but if she was not honest in her testimony about the severity of her pain and the degree to which it limited her ability to function, why would she undermine her own credibility by admitting to activities that were inconsistent with functional limitations she claimed she had? If a claimant falsely testifies that she is incapable of walking more than a block, one would not expect her to admit that, in fact, she typically walks a mile per day. This example simply demonstrates the inherent limitation of the method of evaluating a claimant's credibility set out in SSR 96-7p. To the extent SSR 96-7p requires the ALJ to rely on information the sole source of which is the claimant to assess the claimant's credibility, it is of no value whatsoever. Thus, where as here there exists extrinsic or third party evidence that seriously undermines the claimant's credibility, the fact that her claimed daily activities are consistent with her testimony is of no matter, and the ALJ is free to disregard such evidence. The same is true of such a claimant's testimony concerning the other factors set out in the ruling. The difficulty in assessing claimant's credibility, of course, is that extrinsic evidence from uninterested third parties is often not available.

In any event, the evidence in the record here is more than sufficient to support the ALJ's finding that Kirk was not a credible witness as to the intensity, persistence, and limiting effects of her symptoms. The ALJ's articulation of his reasons for disbelieving her account of her symptoms

24

is sufficient to allow the Court to follow his reasoning and to see the consistency between the ALJ's credibility determination and the evidence of record. *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997). Rather than offer mere boilerplate or an empty recitation of the factors he was to consider, the ALJ referenced specific facts in the record that demonstrated the path of his reasoning. In light of the deference owed the ALJ, no more is required.

## II. ALJ's Consideration of Medical Sources

Throughout her brief, Kirk also argues that the ALJ improperly rejected the opinion of Dr. Pinn, but especially Dr. Ahmed, in arriving at her RFC. Both opined that Kirk was incapable of performing any work on a full-time bases, and their reports, if taken as true, would have necessitated a finding that Kirk was disabled. The ALJ rejected their reports, however, and relied instead upon State agency consultants, who concluded that Kirk retained the physical capacity to do at least sedentary work, and Dr. Hauer who, as already noted, testified that her mental impairment would result in only moderate difficulties with her concentration, persistence, and pace. The ALJ did not err in doing so.

It is true that the opinion of a treating physician can in many cases be controlling. But this is not always the case:

> A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir.2000). Nonetheless, a claimant is not entitled to disability benefits simply because her physician states that she is "disabled" or unable to work. *See Clifford*, 227 F.3d at 870. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. *See id.*; 20 C.F.R. § 404.1527(e)(1).

*Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Seventh Circuit has urged reviewing courts to keep in mind the biases that a treating physician may bring to the disability evaluation.

"The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir.1985). The Court has also noted "that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177.

Here, the ALJ acknowledged the Physical Residual Functional Capacities Questionnaire that Dr. Pinn filled out regarding Kirk in December 2005, in which he stated, *inter alia*, that she was significantly limited due to pain and was unable to reach, handle or finger objects more than 25% of an 8-hour workday. (Tr. 27.) He rejected Dr. Pinn's opinion, however, because his treatment records contained "no objective findings to support these opinions and, with regard to upper extremity limitations, he never even identified any impairment that could reasonably be expected to cause such restrictions." (*Id.*) But not only was Dr. Pinn's opinion not confirmed in his own treatment records, it is also inconsistent, as explained above, with the other records, including Dr. Lystecki's reports and especially those of Curative Rehabilitation. For this reason, as well, the ALJ's rejection of Dr. Pinn's opinion was well supported by the record.

The same is true of the ALJ's rejection of Dr. Ahmed's opinion concerning Kirk's mental impairment. Of course, determining the functional limitations of a mental impairment such as depression is inherently difficult and imprecise simply because such a determination necessarily rests to a large extent on the claimant's own statement of what she can or cannot do. Even assuming the truth of a claimant's description of how limited her activities actually are, there are no laboratory tests that are capable of determining whether she is unable to do more because of a mental illness or simply chooses not to because of a lack of desire or motivation, or for secondary gain. Here, for

26

example, Kirk reported to Dr. Ahmed that she felt "extremely overwhelmed, restless, and hopeless," that she struggled with "energy and motivation," and with "finding hope and ambition." (Tr. 263.) She "feels everyone is unsupportive to her, especially in the medical field, and nobody is willing to help her." (*Id.*) She found herself "very distractible." (*Id.*) She reported that at times she "cannot focus." (*Id.*) Sometimes she "entertained suicidal thoughts." (*Id.*) Dr. Ahmed's response was to "provide her with a lot of support and encouragement," prescribe Cymbalta, and write letters to the disability examiner stating that she was incapable of working. (Tr. 261, 255, 422.) It is clear from his letters to the disability examiner that Dr. Ahmed assumes Kirk is unable to work due to her mental illness, but how does he, or anyone else for that matter, make such a determination? From the record, it appears Dr. Ahmed simply believed Kirk. And the other psychologists who simply reviewed the file, and Dr. Krawiec, who reviewed the file and also met with Kirk, either believed her as well or took Dr. Ahmed's word for it that she did indeed suffer from a mental illness, though they disagreed with him as to its severity.

Because the ALJ did not find Kirk a credible witness, it was entirely reasonable of him to reject Dr. Ahmed's opinion as to the extent of her mental impairment, which as the ALJ noted appeared to be based "at least partially, if not more" upon her self-reports rather than objective findings. (Tr. 27.) The ALJ also noted that Kirk had received only conservative treatment with medication and counseling, and there was no evidence that she had ever received or required emergency or inpatient psychiatric treatment. (*Id.*) Her testimony and statements in the record, the ALJ added, were also "not reflective of significant or impairment in functioning." (Tr. 27.) In particular, in the notes from her counseling sessions, Ms. Turba at Catholic Charities consistently stated that Kirk was able to focus on relevant topics. (Tr. 424-90.)

27

Given this record, the ALJ's rejection of Dr. Ahmed's opinion that Kirk was unable to undertake any full-time employment was not unreasonable. The ALJ did not err in his assessment of the weight to be given the opinions of Drs. Pinn and Ahmed, and substantial evidence supports his finding that Kirk's symptoms were not as severe as either doctor opined.

## III. ALJ's Analysis of Plaintiff's RFC

As noted above, the ALJ found that Kirk has the RFC to "perform routine, low stress, sedentary work activity that allows for position changes (sit/stand) and requires very little, if any, bending, twisting, crouching, crawling, or full body movements." (Tr. 21.) Plaintiff takes issue with this RFC determination arguing that the ALJ failed to assess Kirk's work-related abilities on a function-by-function basis as he was required by Social Security Ruling (SSR) 96-8p. (Plaintiff's Br. at 17.) Plaintiff complains that the ALJ did not "specify how long the Plaintiff could sit, stand, walk, or how much the Plaintiff could lift, carry, push and pull." (*Id.*) Kirk also contends that the ALJ failed to properly take into consideration her mental impairment in determining her RFC.

It is true, as Kirk contends, that the RFC should "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in ... 20 C.F.R. § 404.1545[ (b) ]," which include "sitting, standing, [and] walking." See S.S.R. 96-8p, 1996 WL 374184, at *1. But the failure to strictly comply with the ruling does not require reversal in every case. *Zatz v. Astrue*, 346 Fed. Appx. 107,111 (7th Cir. 2009); *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009). The ruling cautions that a failure to make the function-by-function assessment "could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.* Thus, in determining whether reversal is required,

28

the court should look to see whether the ALJ overlooked any of the claimant's physical or mental limitations or restrictions that make a difference.

Kirk contends that the ALJ overlooked the limitations to her RFC resulting from her asthma. She contends that the ALJ should have qualified her RFC by requiring that she not be exposed to dust, fumes, odors, perfumes, and similar irritants. The ALJ specifically noted that Kirk's asthma, like her diabetes and hypertension, was well controlled with treatment compliance and caused her little if any functional limitations. (Tr. 26.) The ALJ also listed some activities Kirk is capable of, including light cleaning, doing laundry, shopping, watching television, caring for pets, and using a computer. (Tr. 20.) In addition, the record reflects that she shared a home with her husband who smoked two packs of cigarettes per day. (Tr. 143.) Given the fact that Wisconsin, like many states, now bans smoking in most places of employment, *see* Wis. Stat. § 101.123(2), almost any sedentary work environment will be less irritating than her home.

In *Nelms v. Astrue*, the Seventh Circuit held that the ALJ's failure to specifically address the effects of the claimant's asthma on his capacity to perform jobs in the light category of work did not warrant reversal:

> In essence the ALJ assumed that some light work exists in the national economy that does not present a threat of concentrated exposure to dust, pollen, fumes, gases, odors, or poor ventilation. Of course, a vocational expert would be uniquely qualified to answer this question-and the ALJ may wish to enlist one on remand-but the ALJ's assumption alone is not so outlandish as to warrant reversal.

553 F.3d 1093, 1099-1100 (7th Cir. 2009).

The same conclusion follows here. Of course, it would have been better for the ALJ to confirm with the vocational expert that the sedentary jobs he identified as falling within Kirk's RFC would not expose her to concentrations of smoke, fumes, dust and odors. But his failure to do so

does not warrant reversal. The assumption that some sedentary work exists in the national economy that does not present a threat of concentrated exposure to dust, pollen, fumes, gases, odors or poor ventilation is not so outlandish as to warrant reversal. *See, e.g., Britton v. Astrue*, 521 F.3d 799, 802 (7th Cir. 2008) (noting testimony of vocational expert that list of sedentary jobs within claimant's RFC would be available in the same numbers even with the further limitations of "no exposure to concentrated fumes, dust, environmental type irritants"); *see also* SSR 85-15, 1985 WL 56857, at *8 (Nov. 30, 1984) ("Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc."). Thus, while it may have been error for the ALJ not to have included a restriction related to Kirk's asthma in his RFC, the error was harmless.

Kirk likewise argues that the ALJ erred in formulating her RFC by not considering her obesity in combination with her other impairments. She correctly points out that SSR 02-1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on her underlying conditions (even if the obesity is not itself a severe impairment) when arriving at a claimant's RFC. She claims that the ALJ's discussion of her obesity is limited to recounting the fact that her doctor consistently encouraged her to lose weight. As SSR 02-1p makes clear, however, obesity is a disease the treatment of which is often unsuccessful. Although obesity that is remediable is not a basis for an award of benefits, *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004), Kirk suggests, without citation to the record and despite the consistent recommendation in her medical reports that she lose weight, that her obesity is the result of the medication she takes for diabetes. (Pl.'s Br. at 20.) Referencing her own testimony concerning her limitations, Kirk then argues that "her excessive weight has an adverse effect on her ability to sit, stand, and walk, especially because

of her lower back, hip, and leg pain," and that the ALJ erred in failing to consider it in formulating her RFC. (*Id.*)

Here, too, the ALJ's consideration of an issue could have been made more clear. This is especially true since Kirk's obesity and the limitations resulting from it was one of the issues that the Appeals Council specifically directed the ALJ to address when it remanded the case after the first hearing. (Tr. 301.) Nevertheless, the failure to explain more clearly his reasoning, by itself, does not require reversal. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004) (holding that ALJ's failure to explicitly consider the effects of obesity may be harmless error). First, it should be noted that Kirk did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning-as it was her burden to do. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). She attributed her functional limitations and restrictions to her fibromyalgia, psoriatic arthritis, and depression/bipolar disorder. The medical records also fail to indicate whether and how her obesity contributes to her limitations. More importantly, the ALJ did not find Kirk's testimony regarding the extent of her limitations, whatever the cause, credible. Finally, the ALJ found that Kirk was limited to sedentary work with an option to sit or stand at her discretion and little, if any, bending, twisting, crouching, crawling, or full body movements – an RFC that would require the least amount of movement and exertion. Thus, in essence, it would appear that the ALJ factored into her RFC whatever limitations her obesity could have caused. *See Skarbeck*, 390 F.3d at 504 (noting that "although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions"). Under these circumstances, the ALJ's failure to explicitly mention her obesity in the course of formulating her RFC does not require reversal.

Kirk contends the ALJ failed to consider and improperly "rejected Plaintiff's impairments related to her fibromyalgia." (Plaintiff's Br. at 18.) In fact, a review of his decision reveals that the ALJ did not find sufficient evidence to support Kirk's claim that she even had fibromyalgia. (Tr. 20.) The ALJ did note that Kirk repeatedly complained of fibromyalgia. (Tr. 26.) But none of the medical records she submitted contain any information as to how, when, or by whom it was determined that she had that condition. The earliest medical report in the record is Dr. Lysecki's November 2001 new patient report at Bellin Health Family Medical Center. The report notes that Kirk was there "to discuss fibromyalgia" and that she stated she "had a long standing history of fibromyalgia for 16 years." (Tr. 157.) No earlier records appear, however, and Dr. Lysecki performed no diagnostic tests herself. In the objective portion of the report, Dr. Lystecki simply documented Kirk's height (5 feet, 8 inches) and weight (334 pounds), noted that she rated her pain as a 7 out of 10, and wrote that "the remainder of the exam [is] deferred." (Tr. 157.) Except for a December 16, 2004 X-ray of her lumbar spine ordered by her chiropractor (Tr. 244) and the November 2008 MRI of her spine (Tr. 576), the reports contain no indication that Dr. Lysecki or any other doctor ever performed any tests to rule out any other condition. No findings of the trigger points that are customarily relied upon as confirmation of a diagnosis of fibromyalgia are contained in the record. Dr. Ringwelsk appears to have looked for "trigger points" during the physical examination he performed as part of his employability evaluation. (Tr. 107.) Dr. Ringwelsk noted that Kirk generally reported no tenderness on palpation of her back and spine, but she assured him that she was tender at "other times." (*Id.*) Viewing the record as a whole, it appears that Kirk reported to each doctor she saw that she had fibromyalgia, but no treating physician ever took steps

to verify the diagnosis. Her report of such a diagnosis simply traveled from doctor to doctor and was repeated in each doctor's report.

Given the absence of any medical evidence of fibromyalgia in the record, the ALJ was justified in rejecting Kirk's claim that she suffered from such an impairment. This is not to say, however, that the ALJ rejected Kirk's complaints of back pain and leg pain entirely. The ALJ did find medical documentation that she had "degenerative disc disease and spondylosis," which he found to be a medically determinable severe impairment. (Tr. 20.) It was in light of this diagnosis that he evaluated the symptoms and functional limitations that she attributed to fibromyalgia. (Tr. 26.) Thus, even though he attributed her difficulties with her back to degenerative disc disease instead of fibromyalgia, the ALJ still evaluated the evidence relating to her pain and functional limitations relating to her back in formulating an RFC.

As to Kirk's other impairments, while the ALJ did not make explicit findings on a function-by-function basis, he did not overlook the effect of the impairments on the relevant functions. In finding Kirk capable of sedentary work, subject to the limitations noted, the ALJ implicitly found that Kirk was able to perform within the limitations that define sedentary work. The ALJ considered the fact that an occupational health physician "recommended a lifting restriction of 30 pounds below the waist, up to 15 pounds above the waist and that [Kirk] should avoid frequent bending and twisting." (Tr. 22.) The ALJ also noted Dr. Pinn's opinion that Kirk "could only rarely lift even ten pounds, look down, twist, bend, stoop, crouch/squat, and climb ladders or stairs." (Tr. 24.) Thus, by finding sedentary work appropriate, the ALJ did specify the amount Kirk could lift (no more than ten pounds). The requirement that she be given a sit/stand option accommodated her need to frequently change positions.

Likewise, the ALJ considered the limitations resulting from Kirk's mental impairment. Upon considering the evidence, particularly the testimony of Dr. Hauer, the ALJ concluded that Kirk had only a mild restriction of daily living activities, no difficulties in maintaining social functioning, and no more than moderate difficulties in concentration, persistence and pace. He gave implicit consideration to this limitation in qualifying her RFC by limiting her to sedentary work involving "routine, low stress" activities. Although Kirk challenges the ALJ's findings as to each of these criteria, the ALJ cited in support of them both the testimony of Dr. Hauer and other evidence in the record. (Tr. 20-21.) She admitted she was able to cook, do light cleaning and shop, read, sew, crochet, use a computer, pay bills, care for pets and for her own personal needs. (Tr. 20.) Although she testified that her pain and physical impairments prevented her from engaging more strenuously in these activities, the ALJ found her testimony not credible and thus was not required to assume the limitations in such activity that she claimed.

The ALJ supported his finding that she was able to maintain social functioning by referencing her good relationship with her family and her regular contact with friends. (Tr. 21.) She reported phone contact with friends and referenced a couple of pen pals. (Tr. 83.) She also testified that normally she got along with other people and did not get into arguments. (Tr. 646.) With respect to her ability to maintain concentration, persistence and pace, the ALJ referenced the counseling records from July of 2005 through July 2007 which consistently noted that her memory was not impaired and she was able to attend and maintain focus. (Tr. 21.) Dr. Krawiec had also found that she had adequate cognitive capacity to understand and carry out simple job instructions. (Tr. 21.) While Kirk notes that the ALJ failed to address portions of these same sources that

suggested she was more limited, it is hard to see what difference it would make in light of the ALJ's credibility finding.

Perhaps the most serious challenge Kirk makes to the ALJ's decision is in her reply brief where she suggests that the ALJ erred by failing to properly incorporate her moderate difficulty in concentration, persistence and pace into his hypothetical question to the vocational expert. (Reply at 7.) Even as to this issue, however, reversal is not required. The first difficulty with this argument, of course, is that arguments presented for the first time in a reply brief are waived. *See Nelson v. La Crosse County Dist. Atty. (State of Wisconsin)*, 301 F.3d 820, 836 (7th Cir. 2002) ("It is well settled that issues raised for the first time in a reply brief are deemed waived."). But even absent waiver, the argument fails under the circumstances of this case.

It is true that under the law of this circuit, moderate difficulty in concentration, persistence and pace is not adequately expressed in a hypothetical to a vocational expert by limiting the claimant to work requiring simple, routine tasks. *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009). And while such an error usually requires reversal, there is an exception where the record reflects that the vocational expert otherwise incorporated the limitation into his analysis. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). Here, the vocational expert was present during Dr. Hauer's testimony, and the ALJ expressly incorporated Dr. Hauer's opinion into his second hypothetical. (Tr. 667.) Under these circumstances, Kirk's mental impairment was adequately taken into consideration.

Kirk suggests that the ALJ overlooked other functions, such as her ability to rotate between sitting or standing for a whole day, to get along with co-workers, and consistently show up at work, but it is clear from his decision that the ALJ found that Kirk was not limited in these areas. The

ALJ found Kirk's testimony concerning her physical limitations not credible and rejected the opinions of her treating physicians to the extent they were based on her complaints. Although Kirk also challenges these findings and contends that in making them the ALJ failed to properly assess her credibility and the opinions of her treating physicians (both arguments that have already been rejected), that is not the same as failing to consider them.

In sum, while it would have been better for the ALJ to have made explicit his findings on a function-by-function basis before expressing her RFC in terms of the exertional level of work Kirk was capable of performing, the Court concludes from its review of the record that the ALJ implicitly found that Kirk was not limited except as expressed in the RFC. *See Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); *see also Depover v. Barnhart,* 349 F.3d 563, 567-68 (8th Cir. 2003) (holding that ALJ's failure to first express claimant's work-related abilities on a function-by-function basis did not require remand where required findings were implicit). Under the circumstances of this case, there is no need to remand to make the findings explicit.

## CONCLUSION

The ALJ's decision is far from perfect; most decisions, including this one, are also far from perfect. But the ALJ adequately explains the path he took to arrive at the conclusion that Kirk did not meet her burden in proving she was disabled within the meaning of the Social Security Act. The decision rests largely on the ALJ's assessment of Kirk's credibility and weight he afforded the opinions of Drs. Pinn and Ahmed. In making these determinations, the ALJ complied with the

Agency's rules and regulations, and each is supported by substantial evidence. Although the ALJ did not first determine Kirk's RFC on a function-by-function basis, he sufficiently considered each limitation the evidence supported. For these reasons, the decision is affirmed.

**SO ORDERED** this _____1st_____ day of December, 2010.


 s/ William C. Griesbach
William C. Griesbach
United States District Judge